IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CYNTHIA CROSSLAND<br>1110 Yellowood Terrace<br>Millville, NJ 08332<br><br>   Plaintiff,<br><br>  v.<br><br>TARGET CORPORATION<br>2137 Rt. 38 East.<br>Cherry Hill, NJ 08002<br><br><br>   Defendant. | CIVIL ACTION<br><br>No.:_____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, Cynthia Crossland, by and through her undersigned counsel, hereby avers as follows:

### I.  INTRODUCTION

1. Plaintiff has initiated this action to redress violations by Target Corporation ("Defendant") for violations of the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 2000e, *et. seq.*), the New Jersey Law Against Discrimination ("NJ LAD" - N.J.S.A. §§ 10:5-1 *et. seq.*) and the Family and Medical Leave Act ("FMLA" – 29 U.S.C. § 2601 et. seq.). Plaintiff was unlawfully terminated by Defendant from her employment, and she suffered damages more fully described/sought herein.

## II. JURISDICTION AND VENUE

2. This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in <u>International Shoe Co. v. Washington</u>, 326 U.S. 310 (1945) and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of this District.

6. Plaintiff properly exhausted her administrative remedies to proceed under federal laws asserted *infra* by filing with the Equal Employment Opportunity Commission ("EEOC") timely and by filing the instant lawsuit within 90 days of receipt of a right-to-sue letter and/or notice of case closure.

## III. PARTIES

7. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

8. Plaintiff is an adult individual, with an address as set forth in the caption.

9. Defendant is a national general merchandise retailer with 1,914 stores across the U.S. and with over 350,000 employees.

10. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## IV. FACTUAL BACKGROUND

11. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12. Plaintiff is a 49-year-old female.

13. Plaintiff began working for Defendant on or about January 8, 2001 and continued to work for Defendant until her unlawful termination on January 14, 2021.

14. During the last approximate 15 years of her employment with Defendant, Plaintiff worked as the Executive Team Leader of Human Resources in Defendant's Cherry Hill, NJ location.

15. For the majority of her time in this position, Plaintiff was the oldest and only permanent Black executive at her location.

16. During her long tenure with Defendant, Plaintiff performed her job duties exceptionally well and did not have a history of progressive discipline for performance or otherwise until she became supervised by a new Caucasian Store Director, Michael Ricciardi.

17. As discussed in more detail below, after coming under the supervision of Ricciardi on or about January 27, 2020, Plaintiff was subjected to constant harassment and disparate treatment because of her race and age and because Ricciardi negatively associated Plaintiff with her mother's health conditions/disabilities.

18. On the same day Plaintiff began being supervised by Ricciardi, Plaintiff was informed by Hang Nguyen (Human Resources Business Partner – hereinafter "Nguyen" – early

3

30s) that Ricciardi had already expressed that he didn't know if he wanted Plaintiff as his HR person. In fact, Plaintiff was informed multiple times that Ricciardi wanted to replace Plaintiff with a younger, far less experienced, Caucasian female (Kathryn Duffy – 20s).

19. Ricciardi made these statements without knowing anything about Plaintiff's prior performance with Defendant (which was stellar) or Plaintiff's work ethic.

20. Around the same time Ricciardi became Plaintiff's supervisor, Plaintiff's mother began to suffer from serious health conditions, including heart complications/failure and a stroke which placed her in the hospital for an extended period of time.

21. Almost immediately after Ricciardi took over as Store Director within Plaintiff's location, Plaintiff informed him that her mother was very ill and that she had been hospitalized since November of 2019. Although the health issues her mother was facing were very serious, Plaintiff informed Ricciardi that she would not let these personal circumstances interfere with her work responsibilities.

22. That same day, Ricciardi later came to Plaintiff's office and said "if you need to take a leave of absence, let me know" (in reference to Plaintiff's mother). However, he was very insincere and cold during this conversation and insinuated that he believed that Plaintiff would not be able to do her job because of her mother's health conditions.

23. Throughout the time Plaintiff worked under Ricciardi's supervision, Plaintiff was consistently treated differently than her younger and non-Black executives/managers.

24. By way of example, and not intended to be an exhaustive list:
    a. Even though Plaintiff's job took place in the HR office and consisted of the administrative functions typical of an HR position, Ricciardi would constantly question the validity of what work Plaintiff performed and would insist that

4

> Plaintiff and her direct reports in the HR department work out on the floor to do unrelated labor such as stocking functions. While Plaintiff's job responsibilities as the head of HR in her store did include interaction with hourly team members and leaders from a Strategic Business Partner role prior to Ricciardi becoming the Store Director, Ricciardi's insistence that Plaintiff and her direct reports perform work on the sales floor always consisted of Plaintiff being directed to stock shelves and push freight. Ricciardi did not require other younger, Caucasian managers and their direct reports to perform work outside of their assigned duties. Notably, Ricciardi's frequent direction to stock and push freight on the floor often made it very difficult for Plaintiff and her direct reports to attend to their regular HR job duties.

b. Ricciardi took the time to meet with and develop other managers under his direct report, but did not do the same with Plaintiff. In fact, months after becoming the store director, Ricciardi admitted that he had not spent any time with Plaintiff and did not know what Plaintiff's work consisted of; and

c. In or about August of 2020, Ricciardi told the five managers under his direct report (including Plaintiff) that he was going to meet with each of them once a week going forward and that he had created a designated notebook for each of the managers, which he was supposed to take notes in each time he met with the managers. However, upon information and belief, Plaintiff was the only manager that Ricciardi met with and the only manager that Ricciardi took notes on and was clearly targeting Plaintiff.

25. In addition, unlike Plaintiff's younger Caucasian counterparts, Ricciardi subjected Plaintiff to baseless performance counseling.

26. Ricciardi met with Plaintiff on August 10th, August 17th, and August 24th. On August 24th, Ricciardi informed Plaintiff that she was being placed on a Performance Improvement Plan ("PIP") after only meeting with her two times prior to that and previously admitting that he had no idea what Plaintiff's work consisted of.

27. Plaintiff did not agree with the decision to place her on a PIP as there was no valid basis to do so. Plaintiff asked to see a copy of the PIP, but Ricciardi initially refused to give this to Plaintiff.

28. Not only was the PIP completely pretextual in nature as there was no valid basis to issue it in the first place, Ricciardi failed to follow all protocols and procedures with respect to the PIP.

29. When an executive is placed on a PIP, the executive is required to create a PIP for herself in response to assist in the performance improvement process. Plaintiff informed Ricciardi that she was unable to do this without seeing a copy of the PIP he was issuing to her. Ricciardi eventually did give Plaintiff a copy of the PIP. Because Plaintiff did not agree with anything in it, she wanted to have a further discussion with him before creating her own PIP.

30. From there, Plaintiff was given the run around about who actually created the PIP or provided the information which led to the creation of the PIP. For example, Ricciardi led Plaintiff to believe that Nguyen provided the information contained in the PIP and also created it. However, when Plaintiff spoke with Nguyen, she informed her that she wrote the PIP based on the information provided to her by Ricciardi.

31. Plaintiff did not feel comfortable drafting her own PIP without first speaking with the person who provided the information for the management-issued PIP, yet Plaintiff was continuously pushed to do so by Ricciardi, Nguyen and Regional Human Resource Manager, RJ Rausch (to whom Plaintiff expressed concerns of the aforesaid harassment on September 8, 2020).

32. Plaintiff eventually created a draft of a PIP action plan (solely because Plaintiff's job was being threatened for not doing so) and submitted it to Ricciardi and Nguyen on September 10, 2020.

33. Following this, Plaintiff had a meeting with both Ricciardi on September 21, 2020. During this meeting, Nguyen typed up another version of an action plan based on Plaintiff's discussion with her and Ricciardi during this meeting and force closed it in the system as Plaintiff signed off on it, which Plaintiff did not.

34. Following this meeting, Plaintiff continued to be harassed by Ricciardi and Nguyen. For example, Nguyen approached Plaintiff at a job fair on October 11, 2020 and suggested that she transfer to a different position within Defendant because she claimed that Plaintiff's relationship with Ricciardi was broken. Nguyen was clearing attempting to get Plaintiff to resign her position and specifically asked Plaintiff to keep quiet about her suggestion.

35. In addition to the above harassment and disparate treatment based on age and race, Plaintiff was also subjected to discrimination and retaliation on the basis of her health/disability and need for reasonable accommodations (time off).

36. Plaintiff has and continues to suffer from Uterine Fibroids, which at times, caused her significant pain, heavy bleeding during her menstrual cycle, and fatigue (among other symptoms).

37. Although Plaintiff has suffered from this condition for years, Plaintiff's symptoms and complications related to this condition began to intensify towards the end of Plaintiff's employment with Defendant.

38. As a result of Plaintiff's aforesaid health condition, Plaintiff is (at times), limited in her ability to perform some daily life activities, including but not limited to working and urinating normally.

39. In or about October of 2020, Plaintiff began to suffer from heart complications related to an adverse and serious side effect Plaintiff experienced related to a new medication Plaintiff was prescribed to treat her fibroids.

40. As a result of these complications, Plaintiff was hospitalized with chest pains and required a medical leave as she was placed on bed rest by her physician for approximately one week.

41. Following this, On October 22, 2020, Plaintiff was required to undergo an emergency hysterectomy as her fibroids had grown so large they had displaced Plaintiff's bladder and Plaintiff was unable to urinate normally or empty her bladder.

42. Thereafter, Plaintiff began a medical leave to undergo surgery. Plaintiff was initially scheduled to be on leave for eight (8) weeks, however, Plaintiff's doctor extended the leave for an additional four (4) weeks.

43. Defendant showed hostility towards Plaintiff's need for a block medical leave, including by calling Plaintiff on the same day of her surgery to suggest that Plaintiff move to another store (presumably so that Ricciardi could formally replace Plaintiff with a the younger Caucasian employee who ultimately ended up replacing Plaintiff after her termination).

44. Plaintiff returned from the block medical leave following her surgery on or about January 14, 2021.

45. *On the same day* Plaintiff returned from her approximate three-month medical leave, Plaintiff was abruptly informed that she was being terminated.

46. The reason provided by Defendant to Plaintiff for her termination was for taking empty boxes from the store and for making a donation to charity on behalf of the store.

47. The stated reasons given for Plaintiff's termination are completely pretextual. First, it was common practice to remove empty boxes for personal use from Defendant's store. In fact, Ricciardi himself removed store boxes to use when he was moving into his new home. Secondly, as part of Plaintiff's job responsibilities, Plaintiff was in charge donations made by the store to local organizations. Plaintiff had therefore performed this function for years. Plaintiff did not execute her job responsibilities with respect to the donation in question in any manner that deviated from required protocols or from how she handled donations in the past.

48. Moreover, upon information and belief, while Plaintiff was out on medical leave, Ricciardi had Kathryn Duffy, a younger Caucasian employee, take over Plaintiff's role. Upon further information and belief, Ms. Duffy formally replaced Plaintiff following Plaintiff's termination.

5. Based on the foregoing, Plaintiff believes and therefore avers that she was subjected to a hostile work environment and terminated from Defendant because of her age, race, actual/perceived/record of disability, in retaliation for engaging in protected activity, and/or because Plaintiff was negatively associated with my mother's health. As it pertains to being negatively associated with Plaintiff's mother's health, Plaintiff believes that Defendant (a) perceived Plaintiff as being distracted when dealing with her mother's health problems outside of

9

work; (b) perceived Plaintiff as having to miss too much time from work to care for her mother; and/or (c) had other negative perceptions of Plaintiff in association with her mother's health problems. In addition to the foregoing, Plaintiff also believes that Defendant failed to accommodate Plaintiff and/or reinstate Plaintiff to the same or similar position she held prior to her FMLA leave or keep her position open during her approximate 12-week medical leave.

<strong>First Cause of Action<br>
<u>Violations of the Americans with Disabilities Act, as amended ("ADA")</u><br>
([1] Actual/Perceived/Record of Disability Discrimination [2] Retaliation<br>
and [3] Failure to Accommodate)</strong>

49. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

50. Plaintiff suffered from qualifying health conditions under the ADA (as amended), which (at times) affected her ability to perform life activities (such as working and urinating).

51. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, Plaintiff did require reasonable accommodations in the form of medical leave due to being hospitalized, placed on bedrest and later to undergo surgery.

52. Plaintiff was abruptly terminated from her employment with Defendant in close proximity to her requests for/utilization of reasonable accommodations, i.e. block medical leave, as she was fired on the same day she returned from leave.

53. Prior to abruptly terminating Plaintiff, Defendant failed to accommodate Plaintiff under the ADA by failing to reinstate her upon her return from medical leave and/or hold her position open during medical leave of absence.

54. Plaintiff believes and therefore avers that she was terminated from her employment with Defendant because of: (1) her known and/or perceived health problems; (2) her

record of impairment; (3) her requested accommodations; and/or (4) Defendant's failure to properly accommodate her

55. These actions aforesaid constitute violations of the NJ LAD.

## Second Cause of Action
## Violations of the Age Discrimination in Employment Act ("ADEA")
### (Age Discrimination and Hostile Work Environment)

56. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

57. As set forth in the factual background section of this Complaint, after coming under the supervision of Ricciardi on or about January 27, 2020, Plaintiff was subjected to constant harassment and disparate treatment because of age.

58. Plaintiff was ultimately terminated on or about January 14, 2021 for completely pretextual reasons.

59. Upon information and belief, Plaintiff was replaced with a younger, less experienced individual following her January, 2021 termination.

60. These actions constitute unlawful age discrimination under the ADEA.

## Third Cause of Action
## Violations of the Family and Medical Leave Act ("FMLA")
### (Interference & Retaliation)

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

63. Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

64. Plaintiff had well over 1,250 hours of service with Defendant during her last full year of employment.

65. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

66. Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

67. Plaintiff requested FMLA-qualifying leave from in or about October of 2020 until on or about January 14, 2021.

68. Defendant committed interference and retaliation violations of the FMLA by: (1) terminating Plaintiff for requesting and/or exercising her FMLA rights and/or for taking FMLA-qualifying leave; (2) by considering Plaintiff's FMLA leave needs in making the decision to terminate her; (3) terminating Plaintiff to intimidate her and/or prevent her from taking FMLA-qualifying leave in the future; and (4) by failing to reinstate Plaintiff to the same or similar position upon her return from FMLA leave.

69. These actions as aforesaid constitute violations of the FMLA.

**Fourth Cause of Action**
**Violations of 42 U.S.C. Section 1981**
**([1] Race Discrimination [2] Hostile Work Environment)**

70. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

71. During Plaintiff's employment with Defendant, she was subjected to discrimination and a hostile work environment through disparate treatment, pretextual

admonishment, and demeaning and/or derogatory treatment (discussed *supra*) because of her race.

72. Plaintiff was ultimately terminated on or about January 14, 2021 for completely pretextual reasons.

73. Following Plaintiff's termination, her duties were given to a younger Caucasian employee who had less experience and seniority than Plaintiff had obtained working for Defendant.

74. Plaintiff believes and therefore avers that she was subjected to a hostile work environment and terminated because of her race.

75. These actions as aforesaid constitute unlawful discrimination and a hostile work environment under Section 1981.

### Fifth Cause of Action
### Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### ([1] Race Discrimination; [2] Hostile Work Environment)

76. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

77. Plaintiff re-alleged and re-states all allegations as set forth in the Fourth Cause of Action of this Complaint as they also constitute identical violations of Title VII.

### Sixth Cause of Action
### Violations of the Americans with Disabilities Act ("ADA")
### ([1] Associational Disability Discrimination; [2] Hostile Work Environment)

78. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

79. Plaintiff's mother has suffered from qualifying health conditions under the ADA, including but not limited to suffering from heart failure and a stroke, which caused serious complications and extended hospitalization.

80. As discussed above, Plaintiff informed Defendant of her mother's health conditions and hospitalization and was subjected to negative treatment and comments in response.

81. Plaintiff believes that Defendant (a) perceived Plaintiff as being distracted when dealing with her mother's health problems outside of work; (b) perceived Plaintiff as having to miss too much time from work to care for her mother; and/or (c) had other negative perceptions of Plaintiff in association with her mother's health problems.

82. These actions as aforesaid constitute violations of the Americans with Disabilities Act, as amended.

### Seventh Cause of Action
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
### ([1] Age Discrimination [2] Hostile Work Environment)

83. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

84. Plaintiff re-alleged and re-states all allegations as set forth in the Second Cause of Action of this Complaint as they also constitute identical violations of the NJ LAD.

### Eighth Cause of Action
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
### ([1] Race Discrimination [2] Hostile Work Environment)

85. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

86. Plaintiff re-alleged and re-states all allegations as set forth in the Fourth and Fifth Cause of Action of this Complaint as they also constitute identical violations of the NJ LAD.

### Ninth Cause of Action
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
### ([1] Actual/Perceived/Record of Disability Discrimination [2] Retaliation and [3] Failure to Accommodate)

87. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

88. Plaintiff re-alleged and re-states all allegations as set forth in the First Cause of Action of this Complaint as they also constitute identical violations of the NJ LAD.

### Tenth Cause of Action
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
### ([1] Associational Disability Discrimination; [2] Hostile Work Environment)

89. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

90. Plaintiff re-alleged and re-states all allegations as set forth in the Sixth Cause of Action of this Complaint as they also constitute identical violations of the NJ LAD.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting retaliation or discrimination in the future against any employee(s);

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

C.  Plaintiff is to be awarded punitive/liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.  Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate, including for emotional distress;

E.  Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.  Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: September 1, 2021